**FINAL FORM BRIEF**

# 12-1270-cv(L)
## 12-1480-cv(XAP)

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



GREAT LAKES BUSINESS TRUST,
GREAT LAKES DREDGE & DOCK CO. LLC,

*Plaintiffs-Appellees-Cross-Appellants,*

*v.*

M/T ORANGE SUN, HER ENGINES, SAILS, BOILERS, TACKLE, ETC., IN REM,
ARCTIC REEFER CORP., INC., ATLANSHIP S.A., IN PERSONAM,

*Defendants-Appellants-Cross-Appellees.*

_____

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## APPELLANT'S PRINCIPAL FINAL FORM BRIEF

Vincent M. DeOrchis
MONTGOMERY MCCRACKEN WALKER
 & RHOADS LLP
437 Madison Avenue, 29th Floor
New York, New York 10022
212-551-7730

Andrew L. Frey
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
212-506-2500

Richard P. Caldarone
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
202-263-3000

*Attorneys for Defendants-Appellants-Cross-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), defendant-appellant Arctic Reefer Corp., Inc. certifies that it has no parent corporations and that no publicly-held company owns 10% or more of its stock. Defendant-appellant Atlanship, S.A. also certifies that it has no parent corporations and that no publicly-held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................1

JURISDICTION ...........................................................................................2

ISSUES PRESENTED....................................................................................3

STATEMENT OF THE CASE .........................................................................3

STATEMENT OF FACTS ..............................................................................4

SUMMARY OF ARGUMENT .......................................................................12

STANDARD OF REVIEW ...........................................................................16

ARGUMENT .............................................................................................17

I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT
      PLAINTIFFS MAY RECOVER LOST PROFITS WITHOUT
      PROVING THAT THE DREDGE LOST ONE OR MORE SPECIFIC
      CONTRACTS AS A RESULT OF THE ALLISION.................................17

      A.    Plaintiffs Must Show That the Allision Resulted in a Lost
            Opportunity for the Dredge to Earn Revenue ...................................17

      B.    The Proof Necessary to Show a Lost Opportunity Is Case-
            Specific...............................................................................19

            1.    The Timing of the Lost Opportunity Varies Across Cases .....19

            2.    While Lost Profits May Always Be Proven Directly by
                  Showing That the Damaged Vessel Lost a Specific
                  Opportunity, Alternate and Inferential Methods of
                  Proving Lost Profits Are Available Only in Appropriate
                  Cases ................................................................................21

      C.    In the Context of This Case, Plaintiffs Must Show That the
            Dredge Lost a Specific Contract. ....................................................27

            1.    Plaintiffs Must Prove That the Dredge Lost an
                  Opportunity to Perform Profitable Work During the Last
                  Stages of the New York Harbor Contracts or Reasonably
                  Soon After Completing Those Contracts................................28

            2.    Proof of a Specific Lost Contract Is Necessary Under the
                  Circumstances.......................................................................30

# TABLE OF CONTENTS
### (continued)

**Page**

a.    Plaintiffs Must Show a Lost Opportunity for the Dredge NEW YORK, Not for Other Dredges ..............30

b.    Because the Dredge Will Not Be Constantly Busy into the Indefinite Future, *The James McWilliams* Is Not Controlling ........................................................32

c.    The Inference That a Damaged Vessel Necessarily Lost Work Because It Had Work at Other Times and Places Is Not Tenable as Applied to This Case......33

II.    THE DISTRICT COURT ERRED IN APPLYING A UTILIZATION RATE THAT IS UNREPRESENTATIVE OF THE DREDGE'S ACTUAL HISTORICAL RATE OF USE .................................................41

A.    The District Court Was Required to Apply the Dredge's Historical Utilization Rate .............................................42

B.    The District Court Erroneously Relied on a Utilization Rate Reflecting Only the Dredge's Single Busiest Period of Work .........44

C.    The District Court's Attempted Justification of the 92.19% Utilization Rate Cannot Stand ........................................48

CONCLUSION ..............................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arch Ins. Co. v. Precision Stone, Inc.*,
  584 F.3d 33 (2d Cir. 2009)................................................................16, 17

*Bolivar Cnty. Gravel Co. v. Thomas Marine Co.*,
  585 F.2d 1306 (5th Cir. 1978).................................................................26

*Bouchard Transp. Co. v. Tug Ocean Prince*,
  691 F.2d 609 (2d Cir. 1982)..............................................................18, 42

*Brooklyn E. Dist. Terminal v. United States*,
  287 U.S. 170 (1932)...............................................................19, 21, 22

*Canal Barge Co. v. Torco Oil Co.*,
  220 F.3d 370 (5th Cir. 2000).................................................................24

*Cape Bille Shipping Co. v. Tug Judy Moran*,
  2007 A.M.C. 2369 (S.D.N.Y. 2007) .......................................21, 24, 25

*Chevron Corp. v. Berlinger*,
  629 F.3d 297 (2d Cir. 2011)...................................................................16

*ConAgra, Inc. v. Inland River Towing Co.*,
  252 F.3d 979 (8th Cir. 2001)............................................................21, 22

*Crain Bros., Inc. v. Duquesne Slag Prods. Co.*,
  273 F.2d 948 (3d Cir. 1959)...................................................................20

*CTI Int'l, Inc. v. Lloyds Underwriters*,
  735 F.2d 679 (2d Cir. 1984)............................................................43, 46

*Delta S.S. Lines, Inc. v. Avondale Shipyards*,
  747 F.2d 995 (5th Cir. 1984)...........................................................24, 25

*Domar Ocean Transp., Ltd. v. M/V Andrew Martin*,
  754 F.2d 616 (5th Cir. 1985)...................................................................43

*Grace v. Corbis-Sygma*,
  487 F.3d 113 (2d Cir. 2007)...................................................................16

*Great Lakes Bus. Trust v. M/T Orange Sun*,
  ___ F. Supp. 2d ___, No. 08-cv-941, 2012 WL 685251
  (S.D.N.Y. Mar. 2, 2012) ..........................................................................3

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lucente v. IBM Corp.*,
310 F.3d 243 (2d Cir. 2002).........................................................................17

*In re M/V Nicole Trahan*,
10 F.3d 1190 (5th Cir. 1994).......................................................23, 24, 25, 39

*Marine Transp. Lines, Inc. v. M/V Tako Invader*,
37 F.3d 1138 (5th Cir. 1994)..............................................................24, 42, 43

*Maritrans Operating Partners LP v. Port of Pascagoula*,
73 F. App'x 733 (5th Cir. 2003).................................................................24

*Moore-McCormack Lines v. The Esso Camden*,
244 F.2d 198 (2d Cir. 1957)................................................................*passim*

*Navigazione Libera Triestina Societa Anonima v. Newtown Creek
Towing Co.*, 98 F.2d 694 (2d Cir. 1938)..............................................18, 22, 33

*Oscar Gruss & Son, Inc. v. Hollander*,
337 F.3d 186 (2d Cir. 2003)....................................................................16

*P. Sanford Ross, Inc. v. Steamtug Bern*,
1930 A.M.C. 1426 (E.D.N.Y. 1930) .......................................................*passim*

*Packard v. Hines*,
1924 A.M.C. 1087 (S.D.N.Y. 1920) ...........................................19, 20, 29, 43

*Prudential Lines, Inc. v. McAllister Bros., Inc.*,
801 F.2d 616 (2d Cir. 1986)....................................................................18

*Senator Linie Gmbh & Co. v. Sunway Line, Inc.*,
291 F.3d 145 (2d Cir. 2002)................................................................16, 17

*Sinclair Refining Co. v. The America Sun*,
188 F.2d 64 (2d Cir. 1951)..................................................................22, 26

*Skou v. United States*,
478 F.2d 343 (5th Cir. 1973)............................................................20, 21, 25

*The Conqueror*,
166 U.S. 110 (1897) ..........................................................................18, 42

*The Gylfe v. The Trujillo*,
209 F.2d 386 (2d Cir. 1954)................................................................*passim*

-iv-

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*The James McWilliams*,
  42 F.2d 130 (2d Cir. 1930) .......................................................*passim*

*The North Star*,
  151 F. 168 (2d Cir. 1907) ...................................................... 18, 38

*Tidewater Marine, Inc. v. Sanco Int'l, Inc.*,
  113 F. Supp. 2d 987 (E.D. La. 2000) ...................................... 44, 49

*Todd Erie Basin Dry Docks v. The Penelopi*,
  148 F.2d 884 (2d Cir. 1945) .......................................................... 18

*Todd Shipyards Corp. v. Turbine Serv., Inc.*,
  674 F.2d 401 (5th Cir. 1982) ......................................... 42, 43, 46

*Weeks Dredging & Contracting, Inc. v. B. Turecamo Towing Corp.*,
  482 F. Supp. 1053 (E.D.N.Y. 1980) ................................ 26, 38, 49

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
  946 F.2d 1003 (2d Cir. 1991) ...................................................... 16

## STATUTES, RULES, AND REGULATIONS

28 U.S.C. § 1291 ............................................................................. 2

28 U.S.C. § 1333(1) ....................................................................... 2

# PRELIMINARY STATEMENT

In January 2008, the tanker M/T ORANGE SUN collided with the dredge NEW YORK, which had just started working on two Army Corps of Engineers contracts to deepen New York harbor.  Defendants Arctic Reefer Corp., and Atlanship S.A., respectively the owner and operator of the tanker, acknowledged responsibility for the accident and paid more than $6 million to plaintiffs Great Lakes Business Trust and Great Lakes Dredge & Dock Co. (collectively, "Great Lakes") to cover the costs of salvaging and repairing the NEW YORK.  Once the dredge returned to service, it completed the contracts to deepen New York harbor, for which plaintiffs received full payment.

Not satisfied with that result, plaintiffs contend that the accident caused them to lose profits.  Given that plaintiffs lost no profits on the two contracts the dredge was performing when the accident occurred—or on a third contract awarded while the dredge was under repair—governing principles of maritime damages law require plaintiffs to show that the dredge lost some other profitable opportunity because of the accident.  And in the specific context of this case and this unique vessel, it is our contention that plaintiffs must identify those opportunities with specificity.  The district court, however, imposed no such requirement; instead, it applied a looser standard designed for merchant-type

vessels, which operate in very different markets.  The district court's decision to award plaintiffs lost profits therefore rests squarely on a legal error.

Even if plaintiffs could recover lost profits, the method used by the district court to calculate the amount of damages was unreasonable and produced a substantially excessive figure.  Instead of calculating lost profits on the basis of the dredge's historical usage rate, the court assumed the dredge would indefinitely maintain the utilization rate it reached during the single busiest period in its thirteen years of existence and determined damages solely on the basis of that rate.  That decision resulted in a windfall for plaintiffs and violates well-established legal standards requiring the application of the dredge's historical utilization rate, which was substantially lower.

## JURISDICTION

The district court had jurisdiction over this action involving a maritime accident under 28 U.S.C. § 1333(1).  The district court's Amended Order and Opinion dated March 2, 2012, finally disposed of all the claims at issue in this case, and the district court entered judgment on that date.  Appellants timely filed a notice of appeal on March 30, 2012, and Great Lakes filed a notice of cross-appeal on April 12, 2012.  This Court has jurisdiction under 28 U.S.C. § 1291.

**ISSUES PRESENTED**

1.     Whether the district court erred in awarding lost profits even though plaintiffs presented no evidence of specific contracts the dredge NEW YORK lost as a result of being out of service for repairs necessitated by the accident.

2.     Whether, if Great Lakes was entitled to lost profits, the district court erred by calculating those profits on the basis of the utilization rate the dredge achieved only during its single busiest period instead of its historical usage.

**STATEMENT OF THE CASE**

This action for damages arises out of the January 24, 2008 allision[1] between the ORANGE SUN and the dredge NEW YORK in New York harbor.  Arctic Reefer and Atlanship accepted responsibility for the accident and agreed to reimburse plaintiffs for the salvage and repair costs resulting from the allision.  See A-1321–22.  That left plaintiffs' claim for lost profits, which is the subject of this appeal, as well as claims for overhead expenses and liquidated damages.

The district court (Katherine B. Forrest, J.) held a three-day bench trial on those claims beginning on January 23, 2012.  Following trial, the court issued a written opinion denying plaintiffs' claims for overhead and liquidated damages but awarding plaintiffs roughly $11.7 million in lost profits plus prejudgment interest. See *Great Lakes Bus. Trust v. M/T Orange Sun*, ___ F. Supp. 2d ___, No. 08-cv-

---

[1]     An "allision" is a collision at sea between a moving vessel and a stationary object.  A-1509:T128.

-3-

941, 2012 WL 685251 (S.D.N.Y. Mar. 2, 2012).  This appeal concerns the district court's award of lost profits; plaintiffs have cross-appealed the district court's denial of overhead costs.

## STATEMENT OF FACTS

*The Allision.*  On January 24, 2008, the M/T ORANGE SUN, an orange juice tanker owned by Arctic Reefer and operated by Atlanship, was unexpectedly subjected to a shearing effect that caused it to veer from its planned course while traversing New York harbor.  A-1485:T29–30.  As a result, the ORANGE SUN collided with the dredge NEW YORK, which was working to deepen the harbor at the time.  *Id.*; A-1362 ¶ 7.  The allision caused damage to the NEW YORK, which spent 194 days undergoing repairs as a result.  *E.g.*, A-1362–64 ¶¶ 9–19.  The dredge reentered service on August 5, 2008.  A-1366 ¶ 33.  Arctic Reefer and Atlanship paid over $6 million to Great Lakes to cover the costs of salvage and repairs.  See A-1321–22.

*The Dredge.*  The NEW YORK is a powerful, highly specialized backhoe dredge designed to remove particularly hard rock.  A-1379 ¶ 23.  The dredge is also unique; no close substitutes for the NEW YORK currently operate in the United States.  *Id.* ¶ 22.  Great Lakes has exclusive use and control of the dredge until April 1, 2020, under a bareboat charter that provides an option to purchase the vessel when the charter expires.  See A-24–99; A-1378 ¶¶ 18–19.

-4-

Because of its specialized nature, the NEW YORK operates in a narrowly defined market.  In geographic terms, the NEW YORK has never operated anywhere except the East Coast of the continental United States and San Juan, Puerto Rico.  A-1380 ¶ 29.  This geographic focus reflects the fact that some East Coast ports, unlike many other ports, have hard rock bottoms that require the dredge's special capabilities.  A-1498:T84.

In fact, a significant proportion of the NEW YORK's work has occurred in a single location.  As its name suggests, the dredge was commissioned and built primarily to work on a project to deepen New York harbor.  A-1380 ¶ 26; A-1381 ¶ 31.  Much of the dredge's work has likewise been confined to that location (see A-14–23; A-100–22; A-123–47; A-148–68; A-230–260; A-465–81); in the words of plaintiffs' CEO, the dredge has only "occasionally" been used elsewhere (A-1380 ¶ 28).  And as far as the record reveals, the dredge worked *only* in New York harbor from November 2007 through the time of trial in January 2012.  See A-1259–1303; A-1470 ¶¶ 9–10; A-1488:T41–43.

The customer base for the NEW YORK is also highly limited.  The dredge has worked almost exclusively on contracts originally awarded by the Army Corps of Engineers.  See, *e.g.*, A-14–23; A-100–22; A-123–47; A-148–68; A-230–260; A-465–81; A-1469–70 ¶¶ 6, 8.  The record discloses only two contracts for the dredge's services that do not trace back to the Army Corps of Engineers.  Both

contracts were small compared to many of the government contracts on which the dredge has worked, and both contracts involved work in New York harbor. See A-148–68; A-230–60; A-465–81; A-1470 ¶ 9.

Plaintiffs would know well in advance about any Army Corps of Engineers contracts that might call for the dredge's capacity to remove particularly hard rock, as bids are typically solicited six to twelve months before the work actually begins. See A-1328 table 2; see also A-1488:T43; A-1504:T106. Similarly, contracts put out by private companies are often first discussed years before work begins. See A-1507:T118–19.

**The New York Harbor Contracts.** At the time of the January 2008 allision, plaintiffs were using the dredge to deepen the Newark Bay channel in New York harbor. A-1362 ¶ 7. The Army Corps of Engineers had awarded plaintiffs the Newark Bay contract in June 2007. A-1365 ¶ 27. Three months later, the Corps awarded Great Lakes a contract to dredge a second channel in the harbor, known as Port Jersey. *Id.* ¶ 28. Then, while the dredge was undergoing post-allision repairs, the Corps gave a third New York harbor contract to Great Lakes, this one to deepen the channel known as Kill van Kull. *Id.* ¶ 29. Great Lakes employed the dredge on all three of these contracts (collectively, "the New York harbor contracts"), completed all three contracts, and lost no profits on any of them. A-1366 ¶¶ 34–35, 37; A-1469 ¶ 5; A-1481–82:T16–17.

-6-

**The Lost Profits Claim.**  It is, in other words, uncontested that plaintiffs' lost profits claim cannot be predicated either on the contracts the damaged dredge was performing at the time of the allision or on the dredge's first post-allision contract.  Nevertheless, plaintiffs filed suit in the district court seeking an award of over $11 million in alleged lost profits in addition to overhead expenses, liquidated damages, and prejudgment interest.  See A-1356–57.  Those claims proceeded to a bench trial in January 2012.

Because plaintiffs lost no profits on the New York harbor contracts, their sole theory of lost profits at trial hinged on the allegation that the post-allision repair period caused the NEW YORK to finish its work on those contracts 194 days later than it would have finished but for the allision.  See A-1469 ¶ 5; A-1482:T19; A-1484:T25.  Plaintiffs complained they were thus 194 days delayed in starting other work; and because Great Lakes has use of the dredge for a fixed period of time through the end of the charter on April 1, 2020, plaintiffs claimed that they forever lost the opportunity to earn those 194 days of revenue.  A-1482:T17.

Despite their reliance on this theory, plaintiffs' witnesses did not testify that the dredge could be expected to work continuously for the indefinite future.  Such testimony would have been strikingly at odds with the dredge's work history, which includes the NEW YORK being laid up without work for roughly nine

months in 2007 and, as Great Lakes' CEO acknowledged, had work for less than half the period between trial and the fourth quarter of 2012. See A-1488:T43; A-1504:T106, 108. Nor did Great Lakes adduce evidence of specific work that the NEW YORK would have performed in the last 194 days of its work on the New York harbor projects or in the period following completion of those projects, but for being laid up for repairs.

Rather, plaintiffs contended that they did not need to demonstrate specific lost opportunities for the dredge in order to recover lost profits. A-1482:T18. Instead, plaintiffs claimed that they could recover lost profits simply because the dredge was busy immediately before and after the allision and might have future opportunities to perform work at various times and places. See, *e.g.*, A-1482:T18–19; A-1382–83 ¶¶ 39–43. The district court accepted the claim that plaintiffs did not have to prove any specific lost contracts, holding that it was sufficient to "show[] that the Dredge was engaged in an active market before and after the repairs." SA-43.

***The Dredge's Utilization Rate.*** Because it concluded that plaintiffs are entitled to lost profits, the district court was required to determine what those profits would have been. To do so, the court simply adopted wholesale the methodology employed by Sam Rosenfarb, an accountant who served as plaintiffs' expert. Rosenfarb purported to measure lost profits as "lost revenues reduced by

-8-

[the variable] costs" avoided as a result of the allision.  A-1430 ¶ 56.  Rosenfarb calculated this measure by multiplying three numbers—the number of days of delay he believed were caused by the allision, the dredge's average daily profit margin, and a utilization rate.  See A-1442–43 Exs. 1.1 & 1.1.1.

For the first number, Rosenfarb simply used the 194-day period the dredge spent under repair.  A-1430 ¶ 56.  To estimate daily lost profits, Rosenfarb calculated the dredge's mean daily profits for all of its contract work from 1999-2006 and for each of the three New York harbor contracts—thereby omitting nine months in 2007 when the vessel was laid up without work.  A-1443 Ex. 1.1.1.  He then weighted each of the resulting profit figures by the number of work days they represented to reach an average daily profit of $58,843.  See *id.*

Rosenfarb took a much more temporally restricted view when choosing a utilization rate.  Instead of considering most of the dredge's history, Rosenfarb calculated only the percentage of days the dredge was assigned to a contract between November 1, 2007 and March 31, 2010.  A-1444 Ex. 1.1.2.  By choosing that narrow time period, Rosenfarb effectively calculated the dredge's utilization rate on the basis of the New York harbor contracts alone.  Great Lakes—and the NEW YORK—began work on those contracts in November 2007, and the dredge worked on no other projects during the time frame Rosenfarb analyzed.  See, *e.g.*, A-1259–1303.  Excluding the days the NEW YORK spent undergoing post-allision

-9-

repair and testing, the dredge was working (on New York harbor contracts) approximately 92% of the time during that period.  See A-1444 Ex. 1.1.2.

That utilization rate is substantially higher than the usage rate of the dredge at times when it was not committed to the New York harbor contracts.  A study conducted by Great Lakes revealed that the dredge had only a 55% utilization rate between the time it was commissioned in 1999 and the end of 2006.  A-1036; A-1492:T60, A-1586:T522–23.  Testimony at trial established that the dredge then sat idle for much of 2007 before work began on the New York harbor contracts in November of that year.  A-1495–96:T72–73.  And after those contracts ended in March 2011, the NEW YORK again became significantly less busy.  Although Great Lakes' CEO was uncertain about the NEW YORK's utilization rate for 2011, that rate fell to either 72% or 85%—despite the fact that the dredge continued to work on the New York harbor contracts through at least March of that year.  A-1303; A-1488:T44.  The dredge stood idle at the time of trial in January 2012 and was not scheduled to perform any work until an undetermined time later in the year.  A-1488:T42–43.  Overall, then, the NEW YORK's utilization rate from the time it was built through September 2012, excluding the time it was working on the New York harbor contracts or undergoing repairs due to the allision, appears to have been little more than 50%.

In short, Rosenfarb calculated the dredge's utilization rate by looking only to the single busiest period in the NEW YORK's thirteen years of operation. The district court nonetheless adopted and applied the 92% utilization rate included in Rosenfarb's report. SA-54. In doing so, the court determined that Rosenfarb's estimate represented a "reasonable" projection of the dredge's future utilization because a competing dredge had been lost at sea and because there was "demand" for the dredge's services. *Id*. On the basis of the 92% utilization rate, the court awarded Great Lakes $11,736,645 in lost profits plus prejudgment interest. SA-60.[2]

The court declined, however, to award Great Lakes its alleged overhead expenses. Because "[a]lmost nothing was said at trial regarding recoverable overhead," the court found that plaintiffs failed to prove any item of recoverable overhead "by a preponderance of the evidence." SA-55. The court similarly declined Great Lakes' request for "reimbursement for liquidated damages relating to the Port Jersey contract," because "there was no evidence" that the Army Corps of Engineers had reached "a final determination" regarding those damages. SA-54–55.

---

[2]     At trial, the parties contested whether plaintiff's post-allision repairs to the dredge took an unreasonably long time. The district court ruled in favor of Great Lakes on that issue, and the question is not presented on this appeal.

## SUMMARY OF ARGUMENT

The district court's award of lost profits to plaintiffs rests on two fundamental legal errors:  First, the court allowed plaintiffs to recover lost profits without requiring them to identify specific contracts that the dredge would probably have performed had it not been laid up for repairs.  Second, the court's damages calculation rested on a utilization rate that was wholly unrepresentative of the dredge's historical usage.

### I.

Under applicable precedents, a plaintiff seeking damages for lost profits must show that it lost an opportunity to commit the vessel to profitable work.  The precise proof necessary to make that showing, however, depends on the facts of the individual case.  For instance, in some cases a plaintiff may show that it lost profits on the work the vessel was performing at the time of the accident; here, however, plaintiffs admit that they lost no profits on the three New York harbor contracts.  Where the vessel's owners were able to complete existing work without loss, they must instead demonstrate the loss of some other post-accident opportunity.

There is a temporal dimension to the required showing.  The NEW YORK was out of service for repairs for 194 days, which the court found delayed completion of the New York harbor projects from approximately October 2010 to March 2011.  Plaintiffs therefore had to prove that the dredge lost an opportunity

either in the last months of those contracts, when it would have been free to take on new work but for the allision, or reasonably soon after completing work on them.

The available methods of proving lost opportunities vary across cases. A plaintiff may always prove lost profits directly by showing that the vessel lost a *specific* opportunity because of the accident. In some situations, inferential proof of lost profits is also available—but each of the potentially available inferences operates only within a well-defined context.

However, none of the inferential methods of proof may be used to demonstrate a lost opportunity under the circumstances of this case. Because the dredge at issue is a unique and highly specialized vessel, for instance, evidence that other, less specialized dredges had work during the relevant time period cannot be used to show that the NEW YORK lost opportunities because of the allision. Although this court has also held that lost profits will be inferred if a vessel has constant work into the indefinite future, plaintiffs cannot rely on that rule because the dredge had been out of work for nine months in 2007 prior to the commencement of the New York harbor projects, was not employed consistently between completion of the New York harbor projects and the time of trial, stood idle at the time of trial, and faced over four months without work in 2012. Against that background, nothing less than evidence of specific lost contracts can support an award of lost profits.

Nor can plaintiffs draw an inference of lost profits either from the fact that the dredge was employed before and after the allision or from the possibility of future projects for the NEW YORK to show an actual loss during the time period affected by the allision. When a vessel like a cruise ship or a ferry is forced out of service, the loss of business is evident. And when a vessel like a cargo ship or a tug operates in a "spot" market full of short-term opportunities, the fact that there is a robust general market for the services of such vessels gives rise to a reasonable inference that the vessel would have gained additional work but for being put temporarily out of commission by an accident. The NEW YORK, by contrast, is a massive, unique, and highly specialized vessel that has no competition and that does not operate in a spot market. Instead, it works on specialized projects for which ordinary dredges are unsuited, in limited geographic locations, mostly for a single government agency, and on long-term contracts known and negotiated well in advance. Because of that context, the existence of particular projects on which the NEW YORK was engaged does not imply—and cannot be used to infer—the existence of other work for the dredge that it lost because of the allision. Plaintiffs can therefore show that the NEW YORK lost a profitable opportunity only by pointing to specific lost contracts that it would probably have performed in the relevant time period but for the allision.

-14-

## II.

Having allowed plaintiffs to recover lost profits on the basis of insufficient and inapt evidence, the court compounded its error by calculating those profits on the basis of a legally untenable utilization rate. The court arrived at the damage award by taking the dredge's average daily revenues and multiplying those revenues by the number of days consumed by the post-allision repairs. The court then had to reduce the resulting figure to reflect the dredge's utilization rate, which the cases hold should be based on its historical utilization experience. The court disregarded that experience, instead applying Great Lakes' proposed 92% utilization rate, which the dredge achieved during its work on the New York harbor contracts. That period was by far the busiest period the dredge has experienced; both before and after working on the New York harbor contracts, the dredge was gainfully employed much less of the time. The utilization rate applied by the district court therefore bears no rational relationship to the dredge's full history.

The district court attempted to justify its application of a 92% rate as a reasonable projection of the dredge's future use. In the face of actual evidence about the dredge's usage history, however, the court was not free to apply a speculative projected usage rate. The 92% rate chosen by the court is, in any case, unreasonable: Both before and after it completed the New York harbor contracts, the dredge achieved utilization rate far below 92% and was without employment

for months at a time, and whatever work the dredge may have lost because of the allision would not have involved dredging New York harbor for the Army Corps of Engineers. There is therefore no reasonable basis—and the district court provided none—for believing that plaintiffs could have utilized the dredge for 92% of the days lost to the allision.

## STANDARD OF REVIEW

"This Court reviews a district court's findings of fact for clear error and its conclusions of law *de novo*." *Senator Linie Gmbh & Co. v. Sunway Line, Inc.*, 291 F.3d 145, 151 (2d Cir. 2002).

The first issue raised by this appeal hinges not on disputed historical facts but on the "[i]dentification of the correct legal standard"—here, for determining whether plaintiffs may recover lost profits—which "raises a pure question of law, as to which [this Court] exercise[s] plenary review." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011); accord, *e.g.*, *Grace v. Corbis-Sygma*, 487 F.3d 113, 118–19 (2d Cir. 2007).

Furthermore, "[a]lthough the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40 (2d Cir. 2009) (internal citation and quotation marks omitted); accord*, e.g.*, *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); *Wolff & Munier, Inc. v.*

*Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009–10 (2d Cir. 1991). This Court's review of the "methodology" the district court applied to determine the appropriate amount of damages therefore "is plenary." *Lucente v. IBM Corp.*, 310 F.3d 243, 261 (2d Cir. 2002). If the Court reaches the propriety of the district court's calculation of damages, that calculation is reviewed for clear error. *See Arch Ins. Co.*, 584 F.3d at 40; *Senator Linie Gmbh*, 291 F.3d at 151.

## ARGUMENT

**I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS MAY RECOVER LOST PROFITS WITHOUT PROVING THAT THE DREDGE LOST ONE OR MORE SPECIFIC CONTRACTS AS A RESULT OF THE ALLISION.**

In order to obtain an award of lost profits, maritime plaintiffs must show that the accident caused the damaged vessel to lose a profitable opportunity. Plaintiffs may always do so by showing specific lost contracts. In some cases, the plaintiff may alternatively rely on certain types of inferential proof. The availability of the various inferential methods of proof, however, depends heavily on the circumstances of the particular case. None of those inferences can serve to prove lost profits in this case, and the district court erred by concluding otherwise.

### A.    Plaintiffs Must Show That the Allision Resulted in a Lost Opportunity for the Dredge to Earn Revenue.

Under long-settled legal principles, an award for maritime lost profits "will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and [when] the amount of such profits is proven with reasonable

-17-

certainty." *The Conqueror*, 166 U.S. 110, 125 (1897). It is therefore "absolutely necessary" that the plaintiff demonstrate an "actual loss" before recovering damages for lost profits. *Id.* (internal quotation marks omitted); accord, *e.g.*, *Prudential Lines, Inc. v. McAllister Bros., Inc.*, 801 F.2d 616, 622 (2d Cir. 1986) ("some actual pecuniary loss"); *Bouchard Transp. Co. v. Tug Ocean Prince*, 691 F.2d 609, 612 & n.2 (2d Cir. 1982) ("actual lost profits"); *Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co.*, 98 F.2d 694, 699 (2d Cir. 1938) ("proven loss of profits"). Proof of that loss "must not be merely speculative, and something else must be shown than the simple fact that the vessel was laid up for repairs." *The Conqueror*, 166 U.S. at 127.

To prove an actual loss under this Court's case law, a plaintiff must show two things. First, the plaintiff must demonstrate "a state of facts from which [the] court . . . can find that there was an opportunity" for plaintiffs to "employ[ its] vessel . . . during the [repair] period in such a way that earnings would have accrued." *The North Star*, 151 F. 168, 175 (2d Cir. 1907). Second, the plaintiff must show "that [it] would probably have availed [itself] of" that opportunity. *Id.* By contrast, "if it appears affirmatively, or if the reasonable inference from the facts established is that there was no opportunity or that [plaintiff] would have rejected the opportunity, if offered, it is impossible for a court . . . to find legitimately that [plaintiff] has sustained actual loss." *Id.*; accord, *e.g.*, *Todd Erie*

-18-

*Basin Dry Docks v. The Penelopi*, 148 F.2d 884, 886 (2d Cir. 1945) (quoting *The North Star*); *The James McWilliams*, 42 F.2d 130, 132 (2d Cir. 1930) ("It must be shown with reasonable certainty that [the vessel] would have been employed if she had been in good repair . . . .").

**B.     The Proof Necessary to Show a Lost Opportunity Is Case-Specific.**

The fundamental principles enunciated in *The North Star* do not result in a uniform standard of proof in every case.  Rather, lost profits awards must be reasonable "when . . . viewed in the setting of the circumstances."  *Brooklyn E. Dist. Terminal v. United States*, 287 U.S. 170, 174 (1932).

**1.     The Timing of the Lost Opportunity Varies Across Cases.**

As a threshold matter, the timing of the lost opportunity plaintiffs must show differs depending on the factual context of the dispute.  In some cases, the owner of a vessel lost profits on the work it was performing at the time the damage occurred.  See, *e.g.*, *Moore-McCormack Lines v. The Esso Camden*, 244 F.2d 198, 201 (2d Cir. 1957); *P. Sanford Ross, Inc. v. Steamtug Bern*, 1930 A.M.C. 1426, 1430 (E.D.N.Y. 1930) (report of commissioner approved by district court); *Packard v. Hines*, 1924 A.M.C. 1087, 1087 (S.D.N.Y. 1920).  When that happens, evidence of those lost profits suffices to establish an actual loss, and the vessel's owner need not demonstrate any additional lost opportunities.

Where, as here, the plaintiff did not lose any profits on work that was in progress at the time of the accident, it must instead show that the vessel lost a post-accident opportunity.  See, *e.g.*, *The Gylfe v. The Trujillo*, 209 F.2d 386, 389 (2d Cir. 1954); *P. Sanford Ross*, 1930 A.M.C. at 1430.  To do so, the plaintiff must normally show that the vessel lost the opportunity to perform work during the repair period.  See, *e.g.*, *Skou v. United States*, 478 F.2d 343, 345–46 (5th Cir. 1973) (citing cases); *Crain Bros., Inc. v. Duquesne Slag Prods. Co.*, 273 F.2d 948, 950 (3d Cir. 1959).  The logic for that timing is straightforward: The accident necessitated repairs that prevented the vessel from taking a contemporaneous opportunity.

The relevant time frame shifts, however, if the vessel was performing work at the time of the accident and successfully completes that work with no loss of profits after the repair period.  In that case, had the accident not occurred, the vessel would have spent some or all of the repair period working on the same contract it later completed.  The question thus becomes whether the plaintiff lost the use of the vessel "during the added" time made necessary by the accident. *Packard*, 1924 A.M.C. at 1087; accord, *e.g.*, *The Gylfe*, 209 F.2d at 389; *P. Sanford Ross*, 1930 A.M.C. at 1430.

2.    **While Lost Profits May Always Be Proven Directly by Showing That the Damaged Vessel Lost a Specific Opportunity, Alternate and Inferential Methods of Proving Lost Profits Are Available Only in Appropriate Cases.**

The proof maritime plaintiffs must produce to show lost profits also differs across cases.  There is one, and only one, generally applicable type of proof: The plaintiff may always show that the vessel lost a *specific* opportunity to perform profitable work.  See, *e.g.*, *Skou*, 478 F.2d at 346; *The Gylfe*, 209 F.2d at 389; *Cape Bille Shipping Co. v. Tug Judy Moran*, 2007 A.M.C. 2369, 2379 (S.D.N.Y. 2007).  Such evidence, of course, directly satisfies the requirement in *The North Star* that plaintiffs demonstrate a lost opportunity.

In certain cases, plaintiffs are also permitted to prove lost profits by alternate and inferential means.  Any particular inferential method of proof cannot, however, be applied indiscriminately to every case.  See *Brooklyn E. Dist. Terminal*, 287 U.S. at 176 (district court's "range of judgment" in choosing the appropriate methodology is not "without limit").  Rather, the appropriateness of the potential inferences depends heavily on the context of the particular dispute.

For example, in some cases the damaged vessel belongs to a fleet of similar vessels owned by the plaintiff.  In such cases, the plaintiff may prove lost profits by demonstrating that it "made full use of its available [vessels] to the extent possible[] and had no spare[s]."  *ConAgra, Inc. v. Inland River Towing Co.*, 252 F.3d 979, 984 (8th Cir. 2001).  "Full[] utiliz[ation]" of the rest of the fleet raises an

inference that the damaged vessel would also have been employed. *Id.* at 985. This method of proof makes no sense—and is not applied—where the plaintiff operates only a single vessel of the type at issue.

When there is no fleet, the plaintiff may instead sometimes demonstrate an actual loss by proving "the cost of a substitute" vessel. *Sinclair Refining Co. v. The America Sun*, 188 F.2d 64, 66 (2d Cir. 1951). The suitability of that kind of evidence, however, is also limited: The cost of a substitute vessel provides competent proof of an actual loss only when the plaintiff actually incurred that cost by hiring a substitute. *Brooklyn E. Dist. Terminal*, 287 U.S. at 177.

This Court employed a third type of inference in *The James McWilliams*, on which the district court relied in this case. Specifically, the Court held that a plaintiff may show lost profits by demonstrating that the damaged vessel has consistent "work available" to it "for a long period in the future." 42 F.2d at 132. Where that is true, the Court held, it is "fair to say that [the vessel] was delayed throughout its future work to the extent of the [repair period]." *Id.*

Once again, the scope of this inference is limited. The owners of a vessel that will be kept continuously occupied into the relatively distant future may be entitled to lost profits. The owners of a vessel that the trial record shows sat "idle more days than those which she . . . lost" to the allision, by contrast, have "prima facie . . . suffered no loss and . . . ought to recover no damages." *Newtown Creek*,

98 F.2d at 699; accord *P. Sanford Ross*, 1930 A.M.C. at 1430 ("The idleness of the dredge between May 17, 1926 and August 25, 1926, and for the entire period from September 23, 1926, to date, would seem to negative the idea that a twelve days' delay for repairs in January and February, 1926, could have resulted in any loss to the [plaintiff] . . . .").

Perhaps the most frequently applied inferential method of proving lost profits involves the so-called "ready market" test. That test, where appropriate, allows plaintiffs to prove lost profits by showing that "the [damaged] vessel was active in a ready market." *In re M/V Nicole Trahan*, 10 F.3d 1190, 1194 (5th Cir. 1994) (internal quotation marks omitted); accord *Moore-McCormack*, 244 F.2d at 201. In other words, the test allows the owner of the damaged vessel to present evidence either that (1) the vessel was busy just before and after the repair period, or (2) that the market for similar vessels was robust during the repair period. *See, e.g.*, *Nicole Trahan*, 10 F.3d at 1194 ("[t]estimony that the voyages before and after the casualty to the vessel were profitable, and that cargo was carried in between"); *The Gylfe*, 209 F.2d at 389 (market for tankers of a particular sort). In some cases, it is a fair inference from such evidence that, but for the damage, the vessel would have been kept busy during the repair period—and thus that the damage caused the vessel to lose profitable employment. *E.g.*, *Nicole Trahan*, 10

-23-

F.3d at 1194–95; *Delta S.S. Lines, Inc. v. Avondale Shipyards*, 747 F.2d 995, 1001

(5th Cir. 1984).

The inference that underpins the "ready market" test, like the other

inferences that are sometimes applied to show lost profits, make sense only in

particular contexts.  The ready-market inference is almost exclusively applied

when the damaged vessel is one—such as a tramp freighter, barge, or tanker—that

is put out for charter hire to transport goods or persons from place to place.  See,

*e.g.*, *Maritrans Operating Partners LP v. Port of Pascagoula*, 73 F. App'x 733,

734 (5th Cir. 2003) (per curiam) (non-precedential); *Canal Barge Co. v. Torco Oil

Co.*, 220 F.3d 370, 379 (5th Cir. 2000); *Nicole Trahan*, 10 F.3d at 1192; *Marine

Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1142 n.5 (5th Cir. 1994);

*Avondale Shipyards*, 747 F.2d at 1001; *Moore-McCormack*, 244 F.2d at 201.  Use

of the ready-market inference makes sense in cases involving such vessels for two

reasons:

First, charter vessels are fungible; a customer needing a barge to transport

items from Point A to Point B does not, generally speaking, require the services of

any particular barge.  See, *e.g.*, *The Gylfe*, 298 F.2d at 389 (discussing the

schedules of other charter vessels on the same route); *Cape Bille Shipping Co.*,

2007 A.M.C. at 2380 (referring to "comparable vessel[s]").  The market for similar

vessels is, for that reason, a reasonably good indicator of the market for the damaged vessel.

Second, charter vessels such as tankers and barges operate in an active and shifting "spot" market with numerous customers and myriad short-term opportunities to transport cargo from point to point. See, *e.g.*, *Canal Barge Co.*, 220 F.3d at 379; *Nicole Trahan*, 10 F.3d at 1194; *Skou*, 478 F.2d at 346; *Cape Bille Shipping Co.*, 2007 A.M.C. at 2380–81. The constant demand provided by an active spot market is crucial to the ready-market inference. In particular, if the damaged vessel found spot market work both before and after the accident and repair period, the existence of a market with many short-term opportunities permits the inference that the damaged vessel lost an opportunity for work. Moreover, when a vessel operates on a "catch as catch can" basis in a market with constantly shifting opportunities, it is very difficult to pinpoint specific cargo a vessel could have carried on the spot market had the vessel not been damaged. *Nicole Trahan*, 10 F.3d at 1194; accord *Avondale Shipyards*, 747 F.2d at 1001.

For both of these reasons, the ready-market inference is well-suited to the context of merchant-type vessels that typically operate on a charter basis. It is thus no surprise that the cases applying that inference almost uniformly concern such vessels. It is equally unsurprising that the exceptional case applying the ready-market inference to a vessel that worked on a contract basis did so precisely

because the vessel often performed short-term "pick up work" on a spot market. *Weeks Dredging & Contracting, Inc. v. B. Turecamo Towing Corp.*, 482 F. Supp. 1053, 1059 (E.D.N.Y. 1980).

The ready market test is, however, no more universal than the other inferential methods of proving lost profits discussed above.  For instance, "[w]here . . . [lost profits are] claimed for a ship used exclusively to transport cargo used in the business of the shipowner" (*Sinclair Refining Co.*, 188 F.2d at 66), the vessel is never placed in any kind of market.  Application of the ready-market inference would therefore be nonsensical.  The "cost of a substitute" vessel instead provides the chief method of proof in such cases.  *Id.*  To take another example, if the damaged vessel is used to dredge gravel that the vessel's owner then sells to customers, the owner loses profits on the gravel, not on the vessel.  A plaintiff in that situation must therefore show that it "lost . . . sales, revenues, or potential customers" of gravel because the vessel was unable to dredge additional gravel during the repair period.  *Bolivar Cnty. Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306, 1307 (5th Cir. 1978).

In short, although a plaintiff may always prove lost profits by showing that its damaged vessel lost a specific contract or opportunity that plaintiff would have accepted but for the damage, the alternate and inferential methods of proving lost profits may be used only when the facts indicate that a particular inference is

-26-

appropriate. Otherwise, there is a significant risk of awarding a windfall of "profits" that never would have been earned.

### C. In the Context of This Case, Plaintiffs Must Show That the Dredge Lost a Specific Contract.

In this case, plaintiffs did not show what specific additional work the NEW YORK would have performed had it not been laid up for repairs as the result of the allision. Plaintiffs instead argued that they did not have to do so and sought to recover lost profits on the basis of the three inferential theories discussed above. See, *e.g.*, A-1482:T17–18. Essentially, plaintiffs contended that they were entitled to lost profits on the basis of (1) evidence of demand for other dredges, (2) the fact that the NEW YORK was kept busy in New York harbor from late 2007 through 2010, and (3) the existence of potential future opportunities for the dredge. See, *e.g.*, *id.*; A-1382–83 ¶¶ 36–42; A-1513:T141–42; A-1515:T149–51; A-1469–70 ¶¶ 6, 9–10. With the exception of two contracts for the NEW YORK that would begin later in 2012, the "opportunities" plaintiff identified for the dredge rested on nothing more than speculation that the Panama canal expansion and unspecified "developments in the Liquid Natural Gas . . . market" might create work for the NEW YORK. A-1382–83 ¶¶ 40–42.

But even if it be accepted that such work would be available for the NEW YORK, there is a second, equally important element of the claim for lost profits: It

-27-

must be shown that the opportunity to perform the work was lost because of the allision. Here, there was neither evidence nor finding that such was the case.

The district court accepted plaintiffs' contention that this Court's decision in *The James McWilliams* permitted Great Lakes to receive lost profits even without "prov[ing] that [it] lost or turned down a specific contract or contracts while the Dredge was under repair." SA-43. Instead, the court held, plaintiffs could recover lost profits on the basis of the ready-market inference by showing that "the Dredge was engaged in an active market before and after the repairs." *Id*. The court concluded that plaintiffs had satisfied that burden. SA-44. This was legal error. Under the circumstances of this case, plaintiffs may recover lost profits only upon showing that the allision caused the NEW YORK to lose a specific contract or contracts. As we now explain, such proof is necessary because none of the alternate methods of proof can, under the circumstances of this case, plausibly give rise to the inference that plaintiffs suffered an actual loss.

> **1.    Plaintiffs Must Prove That the Dredge Lost an Opportunity to Perform Profitable Work During the Last Stages of the New York Harbor Contracts or Reasonably Soon After Completing Those Contracts.**

To prove lost profits in this case, plaintiffs cannot rely on the contract the dredge was performing at the time of the allision—or, for that matter, *any* of the three New York harbor contracts—to satisfy their burden of proving an actual loss. The NEW YORK completed its work on those three contracts, and plaintiffs

concede that they were fully compensated for the dredge's work. See A-1366 ¶ 40; A-1469 ¶ 5; A-1481–82:T16–17. Plaintiffs therefore had to show that the allision caused them to lose other work for the dredge. *P. Sanford Ross, Inc.*, 1930 A.M.C. at 1431; *Packard*, 1924 A.M.C. at 1087.

Moreover, because the dredge spent an extended period of time working on the New York harbor contracts after the post-allision repair period, plaintiffs must show that the dredge lost other opportunities either during the final months of its work on those contracts, which the court found would have been completed approximately six months earlier but for the allision, or reasonably soon after those contracts were complete. Plaintiffs substantially completed the last of those contracts in March 2011. A-1366 ¶ 40. Plaintiffs were therefore required to show that the dredge lost opportunities for profitable work in late 2010 or 2011—or at latest 2012, the latter including the first period of extended idleness of the dredge. If it cannot be shown that the allision caused the NEW YORK to lose profitable work during the time up to and including the period of idleness, then there is no basis for any award of lost profits.

Plaintiffs in fact made no showing, and the district court made no sustainable finding, that the allision actually caused the NEW YORK to lose specific work that became available during that period.

### 2. Proof of a Specific Lost Contract Is Necessary Under the Circumstances.

Plaintiffs may, of course, demonstrate an entitlement to lost profits by showing that the NEW YORK lost a specific contract to perform work during the relevant time period. The question is whether the district court erred in allowing them to forego specific proof and rely on one or more of the inferential methods of proof above. It should not have done so.

### a. Plaintiffs Must Show a Lost Opportunity for the Dredge NEW YORK, Not for Other Dredges.

As an initial matter, plaintiffs cannot rely on any inferences concerning any vessels other than the NEW YORK. Unlike cargo-carrying vessels, which are essentially floating tractor trailers that can transport various goods between any two places, the NEW YORK is a highly specialized piece of construction equipment. As plaintiffs themselves repeatedly asserted at trial, the NEW YORK is not fungible with other dredges. *E.g.*, A-1482:T17; A-1483:T24; A-1496–97:T76–77; A-1498:T81. It is instead a massive, exceptionally powerful machine peculiarly suited to the removal of very hard rock. See SA-10 ¶ 14; A-1379 ¶ 23. The NEW YORK is the largest backhoe dredge in the United States. SA-7 ¶ 6. It does not make economic sense to employ the NEW YORK to perform the kind of work that other dredges are capable of performing; rather, it is used to perform

difficult work that would otherwise require underwater blasting and drilling.  A-1496:T76.

The dredge is also unique: It is not part of a comparable fleet of vessels and, in fact, has no competitors or peers of comparable capabilities that operate in the United States.  See SA-7 ¶¶ 6, 8; SA-10 ¶ 15; A-1379 ¶ 22.  No other dredge can handle the hard rock that the NEW YORK was "specifically built to" remove.  SA-10 ¶ 14; see also id. ¶ 15 (noting that clamshell dredges cannot deal with "the hardest materials found in the New York and New Jersey waterways"); A-1496:T76 (listing the possible methods of removing the hardest rock as using the NEW YORK, "building a [new] piece of equipment," or "drilling and blasting" the rock before removing it with a smaller dredge).  Opportunities for the NEW YORK simply do not constitute opportunities for other dredges—and opportunities for other dredges do not constitute opportunities for the NEW YORK.

Plaintiffs accordingly cannot demonstrate an entitlement to lost profits based on opportunities available to other dredges.  In particular, plaintiffs could not prove a lost opportunity for the NEW YORK by presenting evidence that the market for dredges generally was active at the relevant time or that Great Lakes' other dredges were kept busy while the NEW YORK was under repair.  The claims made by plaintiffs' expert about undifferentiated "dredging demand" (see A-1422–29 ¶¶ 42–52) are thus not relevant to whether plaintiffs lost profits as a result of the

allison.  Furthermore, plaintiffs do not claim damages based on the cost of a replacement vessel.  Any proof of lost profits must instead be based on opportunities for the NEW YORK in particular.

> b. **Because the Dredge Will Not Be Constantly Busy Into the Indefinite Future, _The James McWilliams_ Is Not Controlling.**

Although the district court correctly focused its analysis on the NEW YORK, it believed that the inference this Court drew in _The James McWilliams_ was available here to excuse plaintiffs from presenting proof of specific lost contracts.  See SA-43.  That belief is erroneous because the reasoning supporting the result in _The James McWilliams_ is inapplicable to this case.

This Court allowed the plaintiff in _The James McWilliams_ to receive lost profits without proving a specific lost contract because it determined that there was constant "work available for the dredge" "for a long period in the future."  42 F.2d at 132.  That crucial assumption cannot be indulged in this case, because the trial record is directly to the contrary.  The dredge had been idle for the nine months preceding the start of work on the New York harbor projects and had substantial periods of idleness after it finished the New York harbor contracts in roughly March 2011.  As Great Lakes' CEO testified, the dredge stood unutilized at the time of trial and was not scheduled to perform any work for nearly five months in the period following the trial.  A-1488:T42–43; A-1504:T106–08.  It therefore

cannot be said that the dredge "was delayed throughout its future work to the extent of the [time] wasted in connection with the collision and the repairs." *The James McWilliams*, 42 F.2d at 132.

In fact, far from proving an actual loss, the evidence demonstrates that plaintiffs are presumptively ***not*** entitled to an award of lost profits. The time the NEW YORK went without work in 2011 and 2012 roughly equals the 194 days it spent laid up as a result of the allision. The natural inference from those periods of idleness is that the allision did not cause the NEW YORK to lose any work. *See Newtown Creek*, 98 F.2d at 699 (when a vessel sits "idle more days than those which she had lost" as a result of a collision, the vessel's owners "prima facie . . . suffered no loss"); *P. Sanford Ross*, 1930 A.M.C. at 1430. As a result, plaintiffs can show lost profits—if at all—only by proving that the allision caused the dredge to lose specific contracts that it otherwise would have performed in the period between late 2010 and 2012.

     c.    **The Inference That a Damaged Vessel Necessarily Lost Work Because It Had Work at Other Times and Places Is Not Tenable as Applied to This Case.**

The district court also concluded that plaintiffs may prove the NEW YORK lost an opportunity on the basis of the inference applied in the "ready market" cases. More specifically, the district court held that plaintiffs could recover lost profits on the basis of evidence that (1) showed the dredge was employed both at

-33-

the time of the allision and immediately after the allision repairs, and (2) suggested the existence of possible future opportunities for the dredge.  SA-43–44.  In the context of this case, however, neither type of evidence can support the inference that the NEW YORK lost work because of the allision.

As described above, the ready-market inference on which plaintiffs rely has been applied only to vessels that are typically put out for charter hire or that otherwise perform pick-up work in a spot market.  The NEW YORK, however, is not put out for charter hire, and the market for its services is nothing like a spot market filled with shifting, short-term opportunities to carry goods for various customers.  Instead, the NEW YORK operates in a highly constrained and specialized market; remains in one location for months at a time while completing a project; and works on the basis of contracts that plaintiffs enter into well in advance of performance of the work.  Each of these features of the dredge's market and schedule renders the ready-market inference unavailable.

The market for the NEW YORK is exceptionally narrow in two ways.  Since the NEW YORK is designed to dredge particularly hard rock, its work is geographically limited to locations where such rock is found.  Those locations principally exist in a small number of ports on the eastern seaboard of the United States.  A-1498:T84.  It is therefore no surprise that the dredge has worked almost exclusively in East Coast ports.  See A-1380 ¶ 29.  More precisely, the NEW

YORK was designed and commissioned to perform work in New York harbor—
and it has, in fact, performed far more work within that harbor than anywhere else.
See A-14–23; A-100–22; A-123–47; A-1380–81 ¶¶ 28, 29, 31.

The dredge's customer base is, if anything, more limited than its geographic
reach. The great bulk of the NEW YORK's work has been performed for the
Army Corps of Engineers. The Corps awarded the three New York harbor
contracts secured by Great Lakes. A-1365 ¶¶ 27–29. It awarded all of the projects
included in the trial record on which the NEW YORK performed subcontracting
work—although, in each case, a company other than Great Lakes won the overall
contract. See A-14–23; A-100–22; A-123–47; A-1382 ¶ 39. And the Corps is also
the source of the small project to deepen a harbor in Mayport, Florida later in 2012,
which plaintiffs stated at trial will be the NEW YORK's first post-trial work. A-
1488:T43; A-1470 ¶ 8. In fact, the record reveals only two truly private projects
that the dredge completed. Both involved relatively small amounts of work in
New York harbor (see A-1470 ¶ 9)—and plaintiffs almost certainly committed the
NEW YORK to these subcontracts because of the absence of government work for
the dredge.

The market for the NEW YORK thus differs from a spot market at the most
fundamental level: Unlike typical cargo-carrying vessels, the NEW YORK (as a
highly specialized piece of construction equipment) does not enjoy a broad array of

-35-

customers or opportunities.  The dredge has instead been almost exclusively dependent on the decisions of the Army Corps of Engineers to bid out contracts for work in a highly limited geographic area.  Given the very small number of private contracts for the dredge and the substantial periods of inactivity that it has experienced, it is not reasonable to infer that other non-governmental opportunities for the NEW YORK existed—let alone that such opportunities would have been available in the constrained time period relevant to this case.

As for government contracts, the Corps releases contracts suitable for the dredge only on an irregular basis.  For example, although the Corps awarded multiple contracts to dredge New York harbor in relatively quick succession in 2007 and 2008, it then provided no more work the dredge could perform, either in New York or anywhere else, for two years.  See A-1328 table 2; A-1390 ¶ 75; A-1499:T85–86.  The pace of contracts suitable for the dredge since that time has remained very slow.  See, *e.g.*, A-1499:T86–87; A-1504:T106–07.  As a result, the fact that the NEW YORK was performing work for the Army Corps of Engineers at the time of the allision and at the conclusion of the post-allision repair period cannot be used to infer that *other* government contracts would have been available to the dredge but for the allision.

Plaintiffs' treatment of the dredge once it is committed to a particular project confirms that proof of specific lost contracts is required in this case.  Once the

-36-

NEW YORK begins work on a particular project, plaintiffs treat the dredge like a piece of construction equipment. See A-1489:T45. Great Lakes views the NEW YORK as assigned to, and as accruing revenue hours on, the project even when it is not actively working. See A-1493:T62–63; A-1504:T108. The dredge thus stays at the project location until its work there is complete, even if it is inactive for days or weeks at a stretch. Given the length of typical projects for the NEW YORK, the dredge is often committed to a single location for months at a time. See, *e.g.*, A-1499:T88, A-1504:T106.

The dredge's comparative immobility further constrains the opportunities plaintiffs could have accepted for the NEW YORK but for the allision. Even absent the allision, the dredge would have remained committed to the New York harbor contracts well into 2010. Plaintiffs' ability to commit the dredge to additional work at the time it would have been free but for the allision was thus limited to jobs at times and locations the dredge could have timely undertaken consistent with completing its New York harbor obligations. The pool of potential work the dredge might have lost, in other words, is even smaller than the limited market for the NEW YORK's specialized capabilities would suggest.

Finally, the fact that the dredge's schedule is set well in advance flatly precludes application of the ready-market inference in this case. Plaintiffs usually learn about government contracts suitable for the NEW YORK no later than the

time the Army Corps of Engineers issues a call for bids on a contract to deepen a particular channel or harbor. That call occurs long before work on the project commences: The bidding process takes months to complete, and even after the contract is awarded, additional months pass before the winning contractor begins dredging. A-1488:T43; A-1504:T106; A-1328 table 2.

Plaintiffs therefore know about relevant government contracts many months ahead of time. So far as the record reveals, the same is true of the few private opportunities for the dredge. Although those opportunities are negotiated privately instead of gained through a public bidding process, years can pass between plaintiffs' first conversations with a private customer and the time the dredge is mobilized for a project. See A-1527:T199.

Put another way, the NEW YORK—unlike cargo-carrying vessels and even some other dredges (see *Weeks Dredging*, 482 F. Supp. at 1059)—does no "pick up" or "spot market" type work. Plaintiffs thus cannot, and do not, extemporaneously fill gaps in the NEW YORK's work schedule as they go along.[3] Moreover, because the dredge has no peers in the United States, domestic

---

[3]    The record does not reveal whether the dredge's previous subcontracting work had shorter lead time. Even if the dredge could be quickly committed to subcontracts, however, Great Lakes' CEO indicated at trial that he is no longer willing to commit the NEW YORK to subcontracting work. A-1488:T42. Plaintiffs therefore cannot use the theoretical possibility of obtaining subcontracts to support the district court's use of a ready-market inference. See, *e.g.*, *The North Star*, 151 F. at 175.

customers needing the special capabilities of a dredge like the NEW YORK have little choice but to call Great Lakes.  Plaintiffs therefore inevitably learn about every potential opportunity for the NEW YORK months in advance.  Accordingly, by some time in 2011, plaintiffs would have known about every potential opportunity for the NEW YORK during the time period in issue—and if plaintiffs cannot point to evidence of any such opportunities, the only reasonable inference is that *no such opportunities existed*.[4]

In sum, the market for the NEW YORK is structured to reflect the dredge's status as a highly specialized piece of construction equipment.  The market for the dredge differs completely from the market for a cargo-carrying vessel or a tractor trailer: Opportunities for the dredge are circumscribed, irregular, known in advance, and involve significant time commitments.  The potential existence of future work for the dredge—such as the Mayport, Florida, project on which the NEW YORK was due to commence work later this year and the international contract the dredge will fulfill in the future (A-1504:T106–08)—therefore has no

---

[4]    Because contractual opportunities for the dredge originate from a very few customers and are known, negotiated, and finalized months before the dredge actually begins work, a specific-contract requirement is not onerous in the context of this case.  See *Nicole Trahan*, 10 F.3d at 1195 (recognizing that there may be "case[s] in which requiring a vessel owner to prove lost profits specifically would ***not*** be an onerous burden") (emphasis in original).  This contrasts sharply with the proof problems facing charter carriers operating in the spot market, to which the "ready market" mode of analysis has heretofore been applied.

bearing on whether the dredge demonstrably lost work in the relevant period as a result of the allision.  Nor does the fact that the NEW YORK was employed at the time of the allision and immediately following the post-allision repair period.

This is especially true given the highly specialized and particularized nature of the projects on which the dredge was employed.[5]  Neither the existence of New York harbor work for the dredge nor the future opportunities noted by plaintiffs prevented the NEW YORK from sitting idle for ten months in 2007, immediately before the New York harbor contracts began, or from an extended period of unemployment in 2012, not long after those contracts ended.  Because of the nature of the market for the dredge, those contracts also cannot be used to show that plaintiffs could have committed the NEW YORK to additional work but for the allision.

---

[5]    If anything, the fact that the dredge was working on Army Corps of Engineers New York harbor contracts before and after the allision reinforces the inapplicability of the ready-market inference.  That the NEW YORK was kept busy doing the very work for which it was designed does not, and cannot, imply that there were any contemporaneous collateral opportunities that the dredge lost because of the allision.

Moreover, the only New York harbor work awarded by the Army Corps of Engineers between 2008 and the time of trial involved two contracts to deepen the Arthur Kill channel.  See A-1499:T86–87.  Only one of those contracts involved work during 2011 (A-1499:T87), and plaintiffs expressly waived any claim based on that contract at trial (A-1480:T11).  They doubtless did so because the NEW YORK actually worked on that contract, profitably dredging the hardest rock in the relevant portion of the channel.  A-1499:T87.

-40-

\* \* \*

For these reasons, *none* of the inferential methods of proving lost profits that are sometimes applied in maritime cases can possibly support an award here. This is not to say that plaintiffs like Great Lakes could never show entitlement to recovery of lost profits. Rather, any lost opportunity in this context must be shown by directly demonstrating that the allision caused the dredge to lose specific contracts in the period following its return to service. The judgment of the district court must be reversed.[6]

## II. THE DISTRICT COURT ERRED IN APPLYING A UTILIZATION RATE THAT IS UNREPRESENTATIVE OF THE DREDGE'S ACTUAL HISTORICAL RATE OF USE.

Even if plaintiffs were entitled to recover lost profits without showing a specific lost contract, the district court's damages calculation must be vacated. The district court was required to, but did not, base its damages calculation on the NEW YORK's historical utilization rate. Moreover, even if it were legally permissible to project lost profits on some other basis, the rate chosen by the district court was manifestly unreasonable.

---

[6]     Because the district court did not consider the issue in the first instance, this Court need not determine whether plaintiffs proved any lost contracts. There is, however, nothing in the record to indicate that any of the potential opportunities plaintiffs mentioned during trial would have taken place during the requisite time period and at a location the dredge could timely have reached.

### A.     The District Court Was Required to Apply the Dredge's Historical Utilization Rate.

In addition to proving the reasonable probability of an actual loss, a maritime plaintiff seeking lost profits must prove "the amount of such profits . . . with reasonable certainty." *The Conqueror*, 166 U.S. at 125; accord, *e.g.*, *Bouchard Transp. Co.*, 691 F.2d at 612; *Moore-McCormack*, 244 F.2d at 201. "[T]he rule of certainty requires a reasonable degree of persuasiveness in the proof . . . of the amount of damage." *Bouchard Transp. Co.*, 691 F.2d at 612 n.3 (internal quotation marks omitted).

In this case, the district court relied on "the value of [the dredge's] use to her owner in the business in which she was engaged at the time of the collision" as the measure of damages. *The Conqueror*, 166 U.S. at 127. To calculate that value, the court attempted to estimate "'the amount the [dredge] would have earned'" but for the allision. SA-47 (quoting *Moore-McCormack*, 244 F.2d at 201). Following plaintiffs' expert, the court derived that estimate by multiplying the dredge's daily profit, as measured by daily revenues less variable expenses, by both the alleged length of the delay and a utilization rate. See SA-38.

This approach is permissible as a general matter. See, *e.g.*, *Marine Transp. Lines*, 37 F.3d at 1141 (discussing *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401 (5th Cir. 1982)). A court applying this methodology in the maritime context must, however, take care not to award lost profits based on

-42-

unrepresentative periods in the vessel's history.  The goal is to determine how much the damaged vessel would have earned but for the accident.  Exceptionally profitable contracts constitute "a deceptive test" of daily profits "unless it appear[s] that [the vessel] could be hired continuously at [the same] figure." *The James McWilliams*, 42 F.2d at 132 (internal quotation marks omitted); accord, *e.g.*, *Packard*, 1924 A.M.C. at 1087.  The court must therefore consider only contracts that "fairly represent [the vessel's] normal average earnings" (*Moore-McCormack*, 244 F.2d at 201 n.3), under prevailing market conditions at the time of the accident (see *The Gylfe*, 209 F.2d at 389–90 (excluding from consideration profits that accrued before the market "rapidly declin[ed]")).

By the same token, a court calculating maritime lost profits cannot rely on exceptionally busy periods of time when determining the vessel's utilization rate. Calculating damages on the basis of an unsustainable usage rate is as inaccurate as calculating damages on the basis of unsustainably high profit margins, because profits can be earned only when a vessel is actually utilized.  Thus, to ensure that a lost profits award represents the vessel's true earning capacity, courts apply the vessel's historical utilization rate when calculating lost profits.  *Marine Transp. Lines*, 37 F.3d at 1141 (discussing *Todd Shipyards*, 674 F.2d at 414); accord *CTI Int'l, Inc. v. Lloyds Underwriters*, 735 F.2d 679, 683 n.5 (2d Cir. 1984) (recognizing the application of this rule in *Todd Shipyards*); see also *Domar Ocean*

-43-

*Transp., Ltd. v. M/V Andrew Martin*, 754 F.2d 616, 618 (5th Cir. 1985) (applying the "average utilization rate" for similar vessels); *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 1007 (E.D. La. 2000) (applying a combination of the historical rate and the utilization rate of comparable vessels in the period following the accident).

### B.    The District Court Erroneously Relied on a Utilization Rate Reflecting Only the Dredge's Single Busiest Period of Work.

The district court did not follow this rule.  Instead, by adopting the 92.19% utilization rate put forward by plaintiffs' expert, the court chose to determine lost profits exclusively on the basis of the NEW YORK's single busiest period of work in its thirteen years of service.  That choice constitutes legal error.

The 92.19% rate the court applied reflects the dredge's use from November 1, 2007 through March 31, 2010.  See SA-13 ¶ 24; SA-54.  That period in the dredge's history was decidedly atypical.  The NEW YORK was designed and commissioned for the primary purpose of dredging New York harbor.  A-1380–81 ¶¶ 26, 31.  And the period plaintiffs' expert used to calculate the 92.19% utilization rate includes only work the dredge performed on plaintiffs' three New York harbor contracts: The NEW YORK commenced work on those contracts during the first ten days of November 2007 (see A-1259), and worked continuously and exclusively on those projects from that time through roughly March 2011.  See SA-17–18 ¶¶ 42, 44, 46; A-1259; A-1270; A-1288; A-1291; A-1303.  It is

-44-

therefore no surprise that the dredge was kept exceptionally busy during the interval chosen by Rosenfarb and used by the district court.

The NEW YORK did not achieve anything approaching a 92% utilization rate at any other time in its history. From the time the dredge was commissioned in 1999 through the end of 2006, the NEW YORK was utilized only 55% of the time. A-1352; A-1490:T60; A-1586:T522–23.[7] That figure would decrease to about 50% once 2007 is considered: Great Lakes' CEO admitted at trial that the dredge sat idle for the nine months preceding its November mobilization for New York harbor work. A-1495–96:T72–73; accord A-1259.

The dredge's usage also declined substantially after it completed work on the New York harbor contracts. Despite logging significant time in New York harbor during the first months of 2011, the dredge attained a significantly lower utilization rate in that year than during the period considered by the district court. Although Great Lakes' CEO was uncertain about the precise utilization rate for 2011 utilization rate, he testified in conclusory fashion that the rate was either 72% or 85%. A-1488:T44. Furthermore, the dredge stood idle at the time of trial in January 2012, and plaintiffs' CEO admitted that the dredge had work for only

---

[7]    The district court's opinion finds the relevant figure to be 51%. SA-12 ¶ 22 & n.4. The parties agreed at trial, however, that 55% represents the correct usage rate for the period from 1999 to 2006. See A-1492:T60 (Great Lakes' CEO); A:1586:T522–23 (defendants' expert).

about half the period between January and October 2012.  A-1488:T42–43; A-1504:T106–08.  The dredge's anticipated utilization rate for 2012 is therefore significantly lower that its usage in 2011.

The NEW YORK, in other words, achieved a utilization rate much less than 92% from the time it was commissioned until it began work on the New York harbor contracts in November 2007.  It will also attain a utilization rate much less than 92% in the first twenty-one months after plaintiffs substantially completed those contracts.  There can thus be no question that, by applying a 92.19% utilization rate, the district court awarded damages exclusively on the basis of a period in which the dredge worked an exceptionally and atypically high percentage of the time.

By doing so, the district court violated the rule that lost profits must be based on the vessel's *historical* usage rate.  See, *e.g.*, *CTI Int'l*, 735 F.2d at 683 n.5; *Todd Shipyards*, 674 F.2d at 414.  Calculating that "historical" rate requires, at a minimum, that the court consider the lengthy periods from 1999 through October 2007, during which the dredge worked only about 50% of the time.  The district court did not do so, and its calculation of lost profits must accordingly be vacated.

The district court's error, however, runs even deeper.  The court should have ***excluded*** the dredge's work on the New York harbor contracts when determining the utilization rate.  When faced with unusually profitable periods in the history of

-46-

a damaged vessel, courts calculating lost profits do not simply average the representative periods with the unrepresentative periods. Instead, they exclude the unrepresentative periods entirely in order to conform the damages award to the vessel's true earning potential. See, *e.g.*, *Moore-McCormack*, 244 F.2d at 201 n.3; *The Gylfe*, 209 F.2d at 389–90. Because the goal of the damages calculation is to "fairly represent" what the damaged vessel would have earned (*Moore-McCormack*, 244 F.2d at 201 n.3), there is no reason to take a different approach in the utilization rate context. Thus, when a vessel achieves a higher utilization rate on certain contracts or voyages but has an established history of much sparser usage both before and after that work, the unrepresentative period should play no role in the damages calculation.

Whatever work the NEW YORK lost (if any) as a consequence of being laid up for repairs could not have been work on the three New York harbor contracts awarded to Great Lakes, which the dredge actually completed. Nor did the dredge lose work on any other Army Corps of Engineers contracts in New York harbor. The Corps of Engineers awarded only one other New York harbor project that could have involved dredging during the relevant period—and the NEW YORK actually worked on that contract. A-1499:T87.[8] Any work the NEW YORK lost

---

[8]    Plaintiffs therefore expressly conceded at trial that they are "not making a claim for . . . lost profit" on that contract. A-1480:T11.

as a result of the allision is therefore not of a character comparable to the projects that allowed the dredge to attain a 92% usage rate. The dredge's utilization during its work on the three New York harbor contracts should have been excluded from the calculation of the utilization rate to be applied in determining lost profits.[9]

### C. The District Court's Attempted Justification of the 92.19% Utilization Rate Cannot Stand.

The district court's attempted justifications for its use of a 92.19% utilization rate do not save its analysis. The court claimed that it is "appropriate" to apply whatever the "utilization rate for the dredge might be reasonably anticipated going forward." SA-37 ¶ 107. The court thus considered how busy it thought the dredge would be for "the full term of [Great Lakes'] charter"—which is to say, through 2020. SA-20–21 ¶ 56.

The district court's approach of peering into the far future should be rejected. The possibility that the dredge will have work in future years has no bearing on how many days of work the dredge lost in the relevant period following the repairs. As a result, the future work plaintiffs suggested the dredge might obtain—none of which could possibly have occurred during 2010 or 2011, none of

---

[9] If it reaches this issue, this Court need not determine the precise utilization rate the district court should have applied. Defendants note, however, that from the time the NEW YORK was commissioned in July 1999 through the end of October 2007, the dredge was profitably employed 50.75% of the time. If the dredge's work on the New York harbor contracts is included, the rate becomes 60%.

which prevented the dredge from months of idleness in 2012, and none of which

represented business that was lost because of the allision—is irrelevant to the

question of how much work the NEW YORK lost as a result of the allision.[10]  The

district court therefore erred when it concluded that it could determine the

utilization rate on the basis of the dredge's projected use in the indefinite future.[11]

Even if the district court's methodology were proper, its chosen 92.19%

utilization rate would remain indefensible.  The district court cited three snippets of

testimony in support of that rate.  Specifically, it relied on statements that the NEW

YORK would have "gone on to other work" but for the allision, that "competition

---

[10]    The two cases on which the district court relied do not support its approach. One of those cases simply applied the historical utilization rate of the damaged vessel.  See *Weeks Dredging*, 482 F. Supp. at 1058–59.  The second case, meanwhile, took the vessel's "historical utilization rate" as a baseline.  *Tidewater Marine*, 113 F. Supp. 2d at 1007.  It then adjusted that rate on the basis of evidence showing the precise change in the market for comparable vessels during the period for which the plaintiff claimed lost profits.  *See id*.  Evidence of that type—unlike speculation about the vessel's future use—reflects on the probable usage of the damaged vessel during the relevant time period.

[11]    In any event, the district court's conclusion that the dredge would remain busy more than 92% of the time between the time of trial in January 2012 and the expiration of plaintiffs' charter for the dredge in 2020 (SA-20–21 ¶ 56) is unreasonable.  Even after 2012, the dredge will face extended periods of time in which no Corps of Engineers contracts to dredge New York harbor are available: The next such contract will not even be put out for bids until late 2012 (A-1488:T43), and the allision would have no bearing on Great Lakes' ability to obtain that work.  Overall, no more than three years' work remains on the project (*see* A-1380 ¶ 27).  There is thus no basis for the conclusion that the NEW YORK will be able to maintain a 92% usage rate into the future.

for the Dredge had declined once the TAURACAVOR"—the only domestic competitor of the NEW YORK—"was lost at sea," and that "demand for the Dredge[ is] increasing."  SA-54.  None of those statements justifies the conclusion that the dredge would have worked for 92% of the days it lost to the allision.

Testimony that the dredge would have had *some* work cannot support any particular utilization rate.  The utilization rate measures the percentage of days lost to an accident that the damaged vessel would otherwise have spent performing profitable work—and proof that work existed provides no information about how many days the dredge would have worked.  Put another way, evidence that the dredge would have "gone on to other work" proves at most the fact of lost profits, not the amount of damages suffered.

The loss of the TAURACAVOR also cannot justify the district court's application of a 92% utilization rate.  That dredge sank in April 2007. Nevertheless, the NEW YORK sat idle for *six months* thereafter—a period of disuse that ended only when work began on the three New York harbor contracts. The absence of the TAURACAVOR also did not prevent the usage of the NEW YORK from declining sharply once the New York harbor contracts were completed.  Accordingly, even if "competition for the [NEW YORK] had declined once the TAURACAVOR was lost at sea" (SA-54), that decline in competition did not translate into increased work for the NEW YORK.

-50-

That leaves the district court's statement "that demand for the Dredge's unique capabilities was increasing and there was robust national and international demand." *Id*. That statement cannot be squared with the evidence at trial. As discussed above, the NEW YORK's utilization rate before the New York harbor contracts was about 50%—and its utilization rate from the end of the New York harbor contracts through the end of 2012 will not approach 92%. The evidence, in other words, shows consistently limited demand for the NEW YORK except for the period when the dredge worked on the very contracts for which it was designed and built.

Even assuming the district court was correct to find increased demand for the dredge, however, that finding provides an insufficient basis for the application of a 92% utilization rate. As noted above, any opportunities the NEW YORK lost because of the allision would not have been comparable to the dredge's work on the New York harbor contracts. The NEW YORK's work history thus demonstrates that the dredge would have been occupied for only 55% of the time lost to the allision. From that baseline, a bare finding of "increased demand" might justify a 60% utilization rate—but it cannot, standing alone, support a rate of 92%. Accordingly, even if the district court applied the correct methodology, it clearly erred by concluding that that the NEW YORK would have been utilized for 92.19% of the days lost to repair.

-51-

## CONCLUSION

For the reasons above, this Court should vacate the district court's holding that plaintiffs may receive lost profits without proving a specific lost contract, and the case should be remanded to the district court for further appropriate proceedings.  In the alternative, the Court should vacate the district court's calculation of damages and remand for that court to redetermine damages on the basis of the dredge's historical utilization rate or such other realistic basis as the Court deems appropriate.

Dated:      New York, New York
            September 4, 2012

                                        /s/Andrew L. Frey
                                        Andrew L. Frey
                                        MAYER BROWN LLP
                                        1675 Broadway
                                        New York, NY 10019
                                        (212) 506-2500

                                        Vincent M. DeOrchis
                                        MONTGOMERY MCCRACKEN
                                        WALKER & RHOADS LLP
                                        437 Madison Avenue, 29th Floor
                                        New York, NY 10022
                                        (212) 551-7730

                                        Richard P. Caldarone
                                        MAYER BROWN LLP
                                        1999 K Street, N.W.
                                        Washington, DC 20006
                                        (202) 263-3000

                                        *Attorneys for Defendants-Appellants-
                                        Cross Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(a) because it contains 12,874 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word 2007 in Times New Roman 14-point type for text and footnotes.

Dated:        September 4, 2012

/s/Andrew L. Frey
Andrew L. Frey
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
(212) 506-2500

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system on September 4, 2012.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Andrew L. Frey_____
Andrew L. Frey
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
(212) 506-2500